# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| Jasmon Stallings (B-83576), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16 C 11063 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| Lt. Best, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jasmon Stallings, an Illinois prisoner, contends that he was deprived of due process when, after a prison disciplinary committee found that he had violated prison rules prohibiting contraband, he was confined for six months in segregation with rampant pests. Defendants, the Illinois Department of Corrections committee members who presided over Stallings's hearing, have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defendants' motion [64], memorandum [65], Local Rule 56.1 statement [66], and Local Rule 56.2 "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" [67]; Stallings's response (styled as a "motion to respond/oppose to defendants statement of facts according to local rule 56.1") [73]; Declaration [74]; and "statement of disputed factual issue" [75]; and Defendants' reply [76] and response to Stallings's declaration [77] are before the Court. For the reasons stated below, Defendants' motion is granted.

**I.     Northern District of Illinois Local Rule 56.1**

Stallings is proceeding *pro se*.[1] Defendants thus served him with a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment" (Dkt. 67) that explains how to respond

---

[1] In mid-2017, Stallings asked the Court to recruit counsel to represent him. (Dkt. 27.) The Court

properly to a motion for summary judgment and statement of material facts under Federal Rule of Civil Procedure 56 and Local Rule 56.1. Under the Court's Local Rules, a moving party must provide "a statement of material facts as to which [it] contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)).

In response to Defendants' statement of facts, Stallings filed a 15-page document entitled "motion to respond/opose [sic] to defendants statement of facts according to Rule 56.1" in which he generally agreed or disagreed with Defendants' factual statements with some narrative, and attached 76 pages of exhibits. (Pl. Resp., Dkt. 73). He also submitted a "declaration in opposition" to Defendants motion (Pl. Decl, Dkt. 74), and a "Statement of Disputed Factual Issues."[2] (Pl. Stmt. Dkt. 75.) Defendants responded to Stallings' Statement of Disputed Factual Issues. (Dkt. 77.) Because Stallings is proceeding *pro se*, notwithstanding some deficiencies in his compliance with Rule 56.1, the Court has interpreted his responses generously and will construe them as favorably as the record and Local Rule 56.1 permit, to the extent that he has pointed to admissible evidence in the record that corresponds to Defendants' facts or could properly testify himself about the matters asserted. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th

---

declined at that time, without prejudice to renewal of the request, because Stallings had not demonstrated reasonable efforts to find counsel on his own and because Stallings appeared capable of handling the next steps in the litigation. (Dkt. 31.) Stallings did not renew his request.

[2] Rather than factual issues, this Statement consists almost entirely of a series of open-ended legal questions beginning with "whether," *e.g.*, "whether defendants violated plaintiff 14th amendment"; "whether plaintiff witness should've been called," "whether the elleged [sic] homemade alcohol should've been tested for alcohol"; "whether both occupants of cell should've received a ticket." (Pl. SODF, pg. 1.) Plaintiff's legal arguments will be addressed below.

Cir. 2012); *Sistrunk v. Khan*, 931 F. Supp. 2d 849, 854 (N.D. Ill. 2013); Fed. R. Evid. 602. With these standards in mind, the Court turns to the relevant facts.

## II. Factual Background

On January 13, 2016, correctional officials conducted a shakedown search of Stateville Correctional Center's E-House, cell 329, which Jasmon Stallings, an Illinois prisoner now housed in Lawrence Correctional Center, then shared with cellmate Stanley Yurgaitis. (Def. SOF, ¶¶ 1-2, 8-10; Pl. SOF, Dkt. 74 ¶ 4.) As is relevant here, three types of documents appear to have been created in conjunction with the shakedown search: (1) an Incident Report; (2) a Shakedown Record/Confiscated Contraband document (which Stallings labels a "shakedown slip"); and (3) an Offender Disciplinary Report for Stallings (which the parties deem a "ticket"). (Def. SOF ¶ 10; Dkt. 66-3, pgs. 28, 31, 33; Pl. Resp., Dkt. 73, pgs. 21, 24, 25.)[3]

The Incident Report documents the finding of "1 laundry bag hanging in cell [329] containing (12) bottles of what appears to be 'hooch[,]'[4] . . . "a bag of 'mash[,]' . . . (1) homemade 'stinger' and (1) cassette tape player with wrong I/M numbers scratched off," and states that "[d]uring a [sic] interview with I.A. and T.R.T. members, I/M Stallings admitted to

---

[3] Although Stallings purports to dispute multiple facts related to these documents, the parties generally appear to agree on the contents of the documents and the course of events at issue. Unless otherwise noted, Stallings disputes not the *existence or actual content* of these documents but the *correctness* of the contents, for example, whether he should have been ticketed for disciplinary infractions, was guilty of the disciplinary infractions, admitted to possessing contraband, etc. His legal arguments will be addressed below.

[4] The parties describe "hooch" as "homemade wine." (Def. SOF ¶ 14); *see also Mitchell v. McKeithen*, No. 5:14cv157-MW/CJK, 2016 WL 8856694, at * (N.D. Fla. Mar. 23, 2016) ("The [record] seem[s] to indicate that [hooch] is some sort of (poorly) jail-made alcoholic beverage.") (further citations omitted); *Bouman v. Broome*, Civil Action No. 3:13cv847 KS-MTP, 2015 WL 5604275, at *6 (S.D. Miss. Sept. 23, 2015) (noting affiant's statement that "inmates use fruit to create a type of intoxicant commonly known as 'hooch,'" which is "strictly prohibited in the prison setting because of the associated safety and security concerns"); *Ascherman v. Catt*, No. IP 00-133—CH/K, 2003 WL 1562213, at *1 (S.D. Ind. Feb. 26, 2003) ("WVCF prisoners often try to steal fruit juice from cans of fruit so that they can make alcohol (popularly known as 'hooch').").

being in possession of said contraband items." Def. SOF ¶ 10 (citing Ex. 2 ¶ 4); Pl. Resp., Dkt. 73, pg. 24.) The shakedown slip lists "(12) bottles of Hooch[,] (1) bag of mash[,] (1) homemade stinger[, and] (1) cassette player with I/M number scratched off" and indicated that the items were "major contraband" and "properly disposed of." (Def. SOF ¶ 10 (citing Ex. 2 ¶ 4); Pl. Resp., Dkt. 73, pg. 21.)

Finally, the disciplinary ticket, which was provided to Stallings on January 19, 2016, listed offenses of "203 Drugs & Drug paraphernalia" and "308 contraband" and indicated that the reporting Sergeant had "found 1 laundry bag hanging in the cell containing (12) bottles [obscured text][5] 'hooch[,]' . . . "a bag of 'mash[,]' . . . "(1) homemade 'stinger' and (1) cassette player with I/M numbers scratched off. All items were confiscated," and "[d]uring an interview with I.A. and T.R.T. I/M Stallings admitted to being in possession of said contraband items." (Def. SOF ¶¶ 10, 21-23; Dkt. 66-3, pg. 28; Pl. Resp., Dkt. 73, pg. 25.) Stallings complained to the officer who delivered the ticket to him that both he and his cellmate should have received tickets for contraband in their cell and asked her to list his cellmate as a witness, but she instead "threw the ticket in [his] cell." (Pl. Decl., Dkt. 74 ¶ 6.)

The ticket indicated that "[y]ou may ask that witnesses be interviewed, and, if necessary and relevant, they may be called to testify during your hearing. **You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the**

---

[5] Stallings insists that this completely scribbled-through text reads "of what appears to be," and thus, before it was obscured, documented the discovery of twelve bottles "*of what appears to be* hooch." (Pl. Resp., Dkt. 73, pgs. 7, ¶ 35; 9, ¶ 37 (emphasis added.)) He seems to contend that there were two versions of the ticket—one with the obscuring scribbles before "hooch" and one without. (*Id*. at 7, 9; *see also* Pl. Decl., Dkt. 74 ¶ 13) The Court, however, has been unable to locate within the record any version of the disciplinary ticket in which the text preceding "hooch" is unobscured. Instead, Stallings' handwritten note "original ticket" on a copy of the Incident Report within his exhibits suggests that he is in fact comparing the language in the Incident Report with the language of the disciplinary ticket to infer the content of the obscured text. (*See* Pl. Resp., Dkt. 73, pgs. 24, 25.)

**witnesses you wish to have interviewed and specify what they could testify by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee.** You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing." (Def. SOF ¶ 25 (emphasis added.)) Stallings did not fill in and submit the blank witness portion of the form before the hearing. (*Id.* ¶¶ 26, 30; Pl. Resp., Dkt. 73, pg. 25; Pl. Decl., Dkt. 74 ¶ 4 ("They also stress I didn't go by asking for a witness the proper way.")).

On January 25, 2016, the Adjustment Committee, consisting of Defendants Lieutenant Charles Best and then-counselor Lakeisha Acklin, presided over a hearing regarding Stallings's disciplinary ticket. (*Id.* ¶¶ 3-5, 31-33; *see also* 20 Ill. Admin Code § 504.70 (requiring "at least 2 members" of adjustment committee, including, "[t]o the extent possible, a person representing the counseling staff")). At the hearing, Stallings brought mental health records and admitted that he possessed the cassette player but denied responsibility for the other items found during the shakedown search of his cell. (Pl. Decl., Dkt. 74 ¶ 8.) Stallings disclaimed knowledge of the contents of the bottles found in his cell but nevertheless insisted that the shakedown uncovered his cellmate's "eight soda bottles" of "mixed fruit from meal (breakfast trays)," rather than "hooch." (Def. SOF ¶¶ 14-16; Pl. Decl., Dkt. 74 ¶ 4; Pl. Resp., Dkt. 73, pg. 67.)  Stallings informed the committee that only he (and not his cellmate) had gotten a disciplinary ticket for items found in the cell they shared, which he believed to be against protocol; he further asked that his cellmate be called as a witness and that the committee "talk to I.A. Shaw [and] look at the cameras." (Pl. Decl., Dkt. 74 ¶ 8.) He denied having admitted to possessing any contraband

5

except the altered cassette player. (Pl. Decl., Dkt. 74 ¶ 6.) Lt. Best refused to call Stalling's cellmate as a witness[6] and said he would "talk to I.A." (*Id.*)

Over Stalling's objections, the committee found him guilty of both listed violations and recommended disciplinary action, including six months' segregation. (*Id.* ¶¶ 51, 52, 54, 55; Pl. Decl., Dkt. 74, ¶ 9.) The January 25, 2016 Final Adjustment Committee Final Summary Report stated that both the reporting officer and shakedown report documented "12 bottles of hooch, a bag of mash, 1 homemade stinger, and 1 cassette player with numbers scratched off," that Stallings in person had "admitted to possessing the Walkman," and, finally, emphasized that the "[i]ncident report submitted by Sgt. Hanson reflects inmate Stallings admitted that all contraband items were in his possession," satisfying the committee that Stallings "did in fact violate the charges cited." (Def. SOF ¶ 51-52; Dkt. 66-2, pg. 35-36; Pl. Resp., Dkt. 73, pgs. 22-23.) Stallings never spoke to Best or Acklin again. (Def. SOF, Dkt. 66-1, pg. 21 (76:2-11.))[7]

Stallings was moved to F-House segregation after the disciplinary finding. (Def. SOF ¶ 55.) After his transfer, Stallings' former cellmate, Stanley Yurgaitis, sent him an affidavit claiming ownership of the "bottles of fruit."[8] (Dkt. 66-1, pgs. 18-19 (67:15-69:18; Pl. Resp., Dkt.

---

[6] In another apparently unrelated disciplinary proceeding, Stallings was able to have witnesses interviewed. (Pl. Decl., Dkt 74 ¶ 13) (presumably referring to Pl. Resp., Dkt 73., pg. 33.) He provides no background regarding how and when he made a request for witnesses for that hearing.

[7] Stallings under oath at his deposition testified that the disciplinary hearing was "the last time [he] talked to [Best]," but he now claims, completely inconsistently, that he "conversed with" or "complained to" Best "numerous times" "while [Best would] be in in F-house . . . walking around" during Plaintiff's segregation term. (Dkt. 74, pgs. 3, 4.) The inconsistent post-deposition statements in Stallings' declaration are insufficient to create a disputed issue of fact as to whether Stallings spoke to Best after the hearing. *See Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 362 (7th Cir. 2009) ("[L]itigants cannot create sham issues of fact with affidavits that contradict" sworn testimony) (internal quotation marks omitted).

[8] Stallings testified that he "didn't even know [Yurgaitis] was going to write the affidavit" and "didn't receive it until [he] was in F House." (Dkt. 66-1, pgs. 18-19 (67:15-69:18); Pl. Decl. ¶ 74.) This is consistent with the affidavit's date of January 26, 2016, one day after Stallings'

73, pg. 84.) During his six months in segregation, Stallings encountered numerous mice and cockroaches. (Def. SOF ¶ 55; Pl. Decl., Dkt. 74 ¶¶ 10, 11.) Cockroaches invaded early-morning breakfast trays, and Stallings once bit into one; he immediately vomited and had diarrhea for two weeks. (Def. SOF ¶¶ 60-62; Pl. Decl., ¶ 11.) After this incident he began to cover his breakfast trays. (Def. SOF ¶ 63.) He also believes a roach may have crawled into his ear while he slept one night, as for a month his hearing in one ear was decreased. (Def. SOF ¶ 64; Def. Resp. Pl SOF. ¶ 11.) One night, in the dark, Stallings felt a mouse scamper across his bare foot and felt his foot being scratched or bitten; he requested but did not receive treatment for the resulting scratch. (*Id*. ¶¶ 65-66, 73; Pl. Resp., Dkt. 73 ¶ 73.)

Stallings submitted grievances and communications regarding the disciplinary result and segregation conditions but was dissatisfied with the responses. (*See* Pl. Resp., Dkt. 73, pgs. 78-83, 85, 88-93.) This lawsuit followed. The Court dismissed without prejudice any Defendants not mentioned in the body of the complaint, as well as any claim for unconstitutional conditions of confinement directed at Best or Acklin, as Stallings' allegations did not suggest that Best or Acklin knew of the particular conditions of Stallings's segregation cell but failed to respond reasonably. (*Id*., pgs. 3-4.) Nevertheless, the Court found that Stallings's allegations that Defendants denied him constitutionally required procedural protections in conjunction with ordering a term of six months of disciplinary segregation that potentially implicated his liberty

---

disciplinary hearing. (Pl. Resp., Dkt. 73, pg. 84.) In his declaration, Stallings asserts that he received the affidavit before his transfer and showed it to a passing correctional officer, who took a copy with her. (Pl. Decl., Dkt. 74 ¶ 7.) He faults the disciplinary committee for not "mention[ing]" the affidavit (that he testified he had not yet received) in its final decision. (Pl. Resp., Dkt. 73 ¶ 49.) Again, these post-deposition attempts to alter unequivocal deposition testimony (which also conflicts with the documentary evidence) regarding when he received the affidavit do not create a disputed issue of fact.

interest in avoiding atypical and significant hardships in relation to the ordinary incidents of prison life warranted further investigation. (Dkt. 4, pgs. 2-3.)

Defendants moved for summary judgment on this claim. In response, Stallings appears improperly to seek to add a claim that Best was deliberately indifferent to his segregation cell conditions. The Court, however, will not consider this eleventh hour addition. *See Watkins v. Learn It Sys.*, No. 14-CV-8422, 2016 WL 5080490, at *3 (N.D. Ill. Sept. 20, 2016) ("[A] plaintiff's response to a motion for summary judgment cannot add claims to his complaint.") (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)); *see also Nichols v. Best*, No. 15 C 2946, 2017 WL 3872488, at *4 (N.D. Ill. Sept. 5, 2017) ("A district court is not required to consider a new claim first raised in opposition to a motion for summary judgment."). In any event, his attempted addition relies upon his declaration that he told Best of his segregation cell conditions, which, as discussed above, is inconsistent with Stallings's sworn testimony that he never interacted with Best after his disciplinary hearing. Thus, the Court will only consider Stalling's due process challenge to his disciplinary proceedings.

**III.    Analysis**

Defendants argue that they are entitled to summary judgment because the conditions of Stallings's six months in segregation did not implicate a liberty interest, and that, regardless, he received all of the process due to him. Stallings contends that the conditions were sufficiently serious, that he did not receive all required procedural protections, and that the disciplinary decision was flawed. For the following reasons, Defendants' motion for summary judgment is granted.

The federal due process clause does not protect an inmate against "every change in the conditions of confinement having a substantial adverse impact on the prisoner." *Sandin v.*

*Conner*, 515 U.S. 472, 478 (1995) (citing *Meachum v. Fano*, 427 U.S. 215, 224 (1976)). Instead, "the procedural protections of the Due Process Clause will only be triggered if state action implicates a constitutionally protected interest in life, liberty, or property." *Lekas v. Briley*, 405 F.3d 602, 607 (7th Cir. 2005).

In the context of prison disciplinary proceedings, a prisoner is entitled to due process protections, such as the procedural mechanisms set forth in *Wolff v. McDonnell*, 418 U.S. 539, 559, 565-66 (1974), only when the penalty faced by the prisoner implicates a liberty interest because it affects the nature or duration of his confinement. *Sandin*, 515 U.S. at 486 (noting that confinement "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction"); *Lekas*, 405 F.3d at 607 ("[I]t follows that a plaintiff cannot under Section 1983 complain of procedural due process violations unless the state has first deprived him or her of such a constitutionally protected interest.") (citations omitted); *Eichwedel v. Chandler*, 696 F.3d 660, 675 (7th Cir. 2012) (discussing loss of good-conduct credits); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (long-term disciplinary confinement); *Kervin v. Barnes*, 787 F.3d 833, 836-37 (7th Cir. 2015) (other disciplinary confinement). Stallings does not suggest that discipline affected the duration of his overall confinement so the Court will consider if the nature of his six-month segregation confinement implicated a liberty interest and then address the process provided during his disciplinary proceedings.

### A. Liberty Interest

The Court begins by distinguishing between claims challenging an inmate's conditions of confinement and due process claims, like Stallings's, that challenge the circumstances of an inmate's placement in particular conditions. The Supreme Court has emphasized that when "a particular amendment 'provides an explicit textual source of constitutional protection' against a particular source of government behavior, 'that amendment and not the more generalized notion

of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (citing *Graham v. Connor,* 490 U.S. 386, 395 (1989)). The Court thus takes care to maintain the distinction between this claim, for which the conditions of confinement must be so atypical and significant as to implicate a liberty interest, and a claim for deliberate indifference of prison officials to objectively serious conditions of confinement, which arises under the Eighth Amendment. *See Townsend v. Fuchs*, 522 F.3d 765, 772 (7th Cir. 2008) ("The issue of the cell conditions in TLU is best analyzed as a claim brought under the Eighth Amendment.").

The mere placement of an inmate in disciplinary segregation does not implicate a due process liberty interest. *Sandin*, 515 U.S. at 485-86. Instead, the conditions potentially rise to the level of a due process violation if they pose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Id*. at 484; *see also Eichwedel*, 696 F.3d at 675; *Marion.*, 559 F.3d at 698. Accordingly, "the right to litigate disciplinary confinements has become vanishingly small." *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997).

"[S]ix months of segregation is not such an extreme term, and, standing alone, would not trigger due process rights." *Marion*, 559 F.3d at 698. Nonetheless, allegations of six months in segregation will trigger an *inquiry* into the conditions of that confinement. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (explaining that segregation duration of six months and one day "alone is insufficient to rise to the level of a Fourteenth Amendment violation" and addressing the conditions of segregation). When determining whether conditions of segregation rise to the level of an "atypical and significant hardship," the Court must consider "the combined import of the duration of the segregative confinement and the conditions endured by the prisoner during that period." *Marion*, 559 F.3d at 697-98. While indefinite placement in an environment

designed to deprive a prisoner of human contact or sensory stimuli, along with revocation of parole eligibility meets this standard, *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005), mere exposure to unsavory conditions worse than those experienced in general population housing generally will not. *See Hardaway*, 734 F.3d at 744 (holding that more than six months in segregation with confrontational cellmate behind solid metal door and with mere weekly shower and yard access was insufficient); *Townsend*, 522 F.3d at 771 ("[E]ven extremely harsh prison conditions may not be so 'atypical' as to create the liberty interest the [Supreme] Court contemplated [in *Sandin*].").

Here, during his six months in segregation, Stallings asserts that he was exposed to six-legged pests that invaded his food trays and body and four-legged pests that skittered over him in the dark. While these conditions are harsh and undesirable, they did not arguably deprive him of human contact or sensory stimuli, and courts have repeatedly found that similar—and arguably worse—cell conditions for extended periods were insufficient to create a protected liberty interest. For example, another court examining the conditions of an inmate's six-month stay in Stateville's F House, which allegedly included prevalent vermin such as cockroaches, black bugs, spiders, and mice, infrequent trash removal, a stained toilet, and insufficient cleaning supplies, held that the conditions were "not so harsh or atypical of the ordinary incidents of prison life to give rise to constitutional due process concerns with his disciplinary hearing." *Sanchez v. Walker*, No. 09 C 2289, 2010 WL 5313815, at *6, 7 (N.D. Ill. Dec. 17, 2010); *see also Hardaway*, 734 F.3d at 744 (finding that inmate's six-month segregation "failed to demonstrate a deprivation of rights that could be considered 'atypical and significant hardship'"); *see also Coleman v. Baldwin*, No. 15 C 5596, 2016 WL 537970, at *4 (N.D. Ill. Feb. 11, 2016) (holding that six months in segregation with insects, mice, broken windows, shower restrictions,

11

and denial of wheelchair and walking cane did not implicate plaintiff's liberty interests); *Chapman v. Willis*, No. 7:12-CV-00389, 2013 WL 2322947, at *11 n.10 (W.D. Va. May 28, 2013) (holding that alleged transfer from "pristine single cell" in one facility to another facility that was "a 'dirty, filthy, stinking, roach and rat infested sewer' with cramped cells, no hot water, broken windows, and rampant drug use" was insufficient to allege "atypical or significant hardship"); *Edwards v. Miller*, No. 15CV0174-LAB (JMA), 2016 WL 1623449, at *6 (S.D. Cal. Feb. 23, 2016), *report and recomm. adopted sub nom. Edwards v. CDCR*, No. 15CV174-LAB (JMA), 2016 WL 1618219 (S.D. Cal. Apr. 22, 2016) (finding that more than five months in cells that were "either too cold or too hot," with unsanitary showers, "rampant" cockroaches, drinking water with chemicals that caused dry mouth, and unsanitary food preparation failed to demonstrate conditions "severe enough to constitute a significant departure from the range of ordinary confinement so as to give rise to a protected liberty interest"); *Williams v. Sanders*, No. 10-1131, 2010 WL 4687840, at *2 (C.D. Ill. Nov. 4, 2010) ("Transferring a prisoner from the general population to segregation unit" with "noisy, unsanitary cells" did "not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest," and is "'within the expected parameters of the sentence imposed by a court of law.'").

Thus, although the conditions Stallings experienced were no doubt unpleasant, they did not implicate a liberty interest. Accordingly, Stallings's segregation did not implicate procedural due process requirements. In the interests of completeness, however, the Court will still address the process provided to him.

### B. Process Provided

Where an inmate's liberty interest is implicated, "due process requires that he receive advance written notice of the charges, the chance to present testimony and documentary evidence

to an impartial decisionmaker, and a written explanation, supported by at least 'some evidence' in the record." *Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006) (citations omitted); *see also Gibson v. Pollard*, 610 Fed. App'x. 571, 574 (7th Cir. 2015) ("The prison did all that it was required to do" when it notified the inmate of the charge and allowed him to appear at the disciplinary hearing and rebut the recommendation that he be placed in segregation).

As an initial matter, to the extent that Stallings believes that the mere issuance of an allegedly false disciplinary ticket against him violates his rights, he is mistaken. Generally, a correctional officer's purported fabrication of a disciplinary charge does not, by itself, give rise to a due process violation. *Lagerstrom*, 463 F.3d at 625. The Seventh Circuit has "long held that as long as procedural protections are constitutionally adequate, we will not overturn a disciplinary decision solely because evidence indicates the claim was fraudulent," *McPherson v. McBride*, 188 F.3d 784, 787 (7th Cir. 1999); *McSwain v. Hendren*, No. 2:17-CV-00158-LJM-MJD, 2017 WL 1382789, at *2 (S.D. Ind. Apr. 18, 2017) ("A prison inmate does not have a constitutional right to be free from false or baseless disciplinary charges.") (citing *Lagerstrom*, 463 F.3d at 624-25).

Due process in the context of a prison disciplinary hearing consists of five requirements: (1) advance, written notice of the disciplinary charges; (2) assistance of a fellow inmate or prison staff member in cases where the inmate is illiterate or the complexity of the issues makes it unlikely that the inmate will be able to defend himself comprehensively; (3) an opportunity to call witnesses and present documentary evidence to the extent consistent with institutional safety and correctional goals; (4) a written statement by the factfinder indicating the evidence relied on and the reasons for disciplinary action; and (5) confirmation that the disciplinary board's decision is supported by "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*,

472 U.S. 445, 454 (1985); *Wolff*, 418 U.S. at 563-72. Stallings challenges only the last three elements.

i.   **Opportunity to Present Testimony and Evidence**

In arguing that he did not receive all process due, Stallings insists that his during-hearing request to call his cellmate as a witness was ineffectual, but he concedes that he did not follow protocol to identify his cellmate as a witness prior to the hearing. Although he wanted the officer who delivered the ticket to complete it for him, the requisite portion of the form was blank in the ticket he received. He concedes that he did not fill it in and submit it, as the form explicitly instructed him to do. (Def. SOF ¶¶ 25-26; Pl. Resp., Dkt. 73, pg. 25.) Nor does Stallings suggest that he sought a related continuance, much less that he showed "good cause" for one under the circumstances. *See* 20 Ill. Admin. Code § 504.80 (providing that inmate may submit witness requests and questions for witnesses "prior to the hearing," that "Adjustment Committee may disapprove witness requests that are not received prior to the hearing," and that inmate "may, upon written request and for good cause shown, be granted additional time")). This does not indicate a violation of his rights.

Next, although Stallings wanted mental health personnel to be notified of his charges and be present at the ensuing hearing, "there is no due process right for mental health to be notified after an inmate is charged with an offense in a prison disciplinary hearing." *Querry v. Warden*, No. 1:17-cv-02708-TWP-MPB, 2018 WL 2321098, at *3 (S.D. Ind. May 22, 2018). And, even if prison procedure provided for mental health personnel to be notified, violations of prison procedure alone do not give rise to a constitutional violation upon which a civil rights claim may rest, as federal courts do not enforce state law or regulations.[9] *Wells v. Butler*, No. 17-CV-029-

---

[9] Similarly, Stallings's argument that correctional practice dictated that correctional officials

DRH, 2017 WL 1366051, at *4 (S.D. Ill. Apr. 12, 2017) (citing *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir. 1988) (en banc); *Pasiewicz v. Lake Cnty. Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001)). Stallings indicates, moreover, that he brought mental health records with him to his hearing. (Pl. Stmt., Dkt. 75, pg. 11.)

Further, although Stallings devotes much of his argument to what he perceives to be an inconsistency between the language of the Incident Report (noting the finding of "what appears to be hooch") and the language of the Disciplinary ticket (noting the finding of "[obscured text] hooch"), the Court can conceive of no potential due process violation from any inconsistency between the language in those documents. After all, Stallings concedes that he knew of and made arguments based upon the language differences at his hearing. (Pl. Decl., Dkt. 74, pgs. 3, 4; Pl. Stmt., Dkt. 75, pg. 7.) The committee's adverse ruling does not affect whether he knew of and was afforded the opportunity to raise the issue.

### ii. Written Statement by Factfinder

Stallings next purports to dispute that the Adjustment Committee issued a sufficient written statement of the evidence. (Pl. Resp., Dkt. 73, pg. 10 ¶ 49.) Again, however, he does not dispute the existence of the Final Summary Report or provide any basis to find that it fails to comport with minimal due process requirements. Regardless, any contention that the Final Summary Report is constitutionally deficient fails, as the report listed the evidence relied on and

---

should have written both him and his cellmate disciplinary tickets (which Defendants deny) for contraband found in their shared cell does not suggest a violation of federal law. *Gray v. Taylor*, 714 F. Supp. 2d 903, 910 (N.D. Ill. 2010) ("Even if Stateville officials violated departmental rules, the matter does not implicate the Constitution. Violations of state law are not, in and of themselves, actionable as constitutional violations."). In any event, unlike cases in which both cellmates deny the ownership of contraband in their cell, here, the reports of the shakedown indicated that Stallings had accepted responsibility for all contraband items, which seems to explain why a ticket would have been issued only to him. Although Stallings disputes claiming any items but the cassette player, he was aware that only he had been issued a ticket for all items when he attended his disciplinary hearing and, in fact, argued that issue.

the reasons for disciplinary action, *see Hill*, 472 U.S. at 454, as it states that the decision was based upon the reporting officer's "reflect[ion]" regarding the contraband found ("12 bottles hooch, a bag of mash, 1 homemade stinger, and 1 cassette player with numbers scratched off"), "shakedown records," and the "[i]ncident report by Sgt Hanson," which "reflects that Stallings admitted that all contraband items were in his possession." (Def. SOF ¶¶ 51-52, 54; Pl. Resp. Dkt. 73, pg. 22.)

### iii. Findings Supported by "Some Evidence"

Finally, Stallings disputes the committee's disciplinary finding that he was guilty of the listed infractions (except that he continues to concede that he possessed an altered cassette player). The "requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board," *i.e.*, if "there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill*, 472 U.S. at 455-56. "In reviewing a decision for some evidence, courts are not required to conduct an examination of the entire record, independently assess witness credibility, or weigh the evidence, but only determine whether the prison disciplinary board's decision . . . has some factual basis." *McPherson*, 188 F.3d at 786 (quotation marks omitted). "This is a lenient standard, requiring no more than a modicum of evidence. Even meager proof will suffice, so long as the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Spicer v. Warden*, No. 3:17-CV-579-JD-MGG, 2018 WL 1912723, at *1 (N.D. Ind. Apr. 23, 2018) (citing *Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000)).

Here, Stallings admits that he consistently accepted responsibility for the cassette player found in his cell, and he addresses no arguments to the "stinger" or "mash" found in his cell. The committee's finding that officers found "hooch" attributable to Stallings is supported by "some

evidence." *See Henry v. Cate*, No. 12-CV-1760-LAB-WMC, 2014 WL 197768, at *1 (S.D. Cal. Jan. 14, 2014) (holding that correctional officer's statement that he found "jars filled with an orange pulpy liquid" and "strong odor of alcohol" was "certainly 'some evidence' that [plaintiff] possessed inmate-manufactured alcohol"); *Barker v. Brown*, No. 2:13-cv-269-JMS-WGH, 2015 WL 500877, at *3 (S.D. Ind. Feb. 5, 2015) (noting that report of finding "3 gallons of what appears and smells like 'Hooch'" that was confiscated and "destroyed provided sufficient evidence for disciplinary action of Indiana prisoner). That Stallings now makes statements contrary to those documented in the reports does not alter this result. *See Troiano v. Thomas*, No. 3:11-cv-01004-BR, 2012 WL 2522291, at *5 (D. Or. June 28, 2012) (upholding discipline despite inmate's "present assertion that the liquid was only juice" due to presence of alcohol and report that inmate had said he saved juice from grapefruit and was "attempting to do something with it").

And, because "only evidence that was presented to the Adjustment Committee is relevant to this analysis," *Hamilton v. O'Leary,* 976 F.2d 341, 346 (7th Cir. 1992), this conclusion is not undermined by the affidavit Stallings's cellmate later sent him, which the committee could not have considered. Nor was Stallings, as he suggests, entitled to have the hearing officers personally examine the bottles found in his cell or to a test for alcohol content on the "hooch," *see Wilson-El v. Zatecky*, No. 1:13-cv-01343-JMS-TAB, 2014 WL 6674773, at *4 (S.D. Ind. Nov. 25, 2014) (rejecting inmate's "argument that the Board improperly refused his request for a test [of the purported alcohol found in his cell during a shakedown] because he is not entitled to such a test at a prison disciplinary hearing") (citations omitted), much less a chain-of-custody document, which has no conceivable impact here. After all, Stallings appears to admit that correctional officers found the bottles referred to in the shakedown documents in his cell (he

disputes the content of the bottles, not their existence); there simply is no suggestion that any mix-up or mistake may have been made as to those bottles or their content. *See Webb*, 224 F.3d at 652–53 ("Absent some affirmative indication that a mistake may have been made, *e.g. Meeks [v. McBride]*, 81 F.3d [717], 721 [(7th Cir. 1996)] (prisoner number on toxicology report did not match petitioner's number, another prisoner had same name as petitioner, and the two prisoners had been confused before), we cannot say that the toxicology report and chain of custody form fail to qualify as 'some evidence' from which prison officials could conclude that [plaintiff] had used marijuana.") (citing *United States v. Brown,* 136 F.3d 1176, 1182 (7th Cir. 1998) (hypothetical possibility of tampering does not render evidence inadmissible, but goes instead to the weight of the evidence)); *Easton v. U.S. Corrs. Corp.*, 45 F.3d 430 (6th Cir. 1994) (rejecting inmate's argument of faulty chain of custody because "[d]ue process [] does not require that these procedures be so comprehensive as to preclude any possibility of error")). Thus, "some evidence" supported the committee's findings.

Accordingly, Defendants' motion for summary judgment is granted.

## IV. Post-Judgment Options

Should Stallings want to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). In that event, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Stallings could be assessed a "strike" under 28 U.S.C. § 1915(g). A prisoner who accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious or for failure to state a claim may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. *Ibid.* If Stallings seeks leave to

proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court. *See* Fed. R. App. P. 24(a)(1). Any such motion must specify the issues that he intends to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C).

Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

### V. Conclusion

For the reasons stated, Defendants' motion for summary judgment [64] is granted in its entirety. Plaintiff's "motion to respond/oppose to defendants statement of facts according to Local rule 56.1" [73], which the Court construes as a response to Defendants' summary judgment submissions rather than a substantive motion, is denied. The Clerk is directed to enter final judgment in favor of Defendants. Any future dates are stricken. This case is closed.

9/10/2018

Jorge L. Alonso
United States District Judge